IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE


LORETTA JUNE KIRKLAND                                           PLAINTIFF

v.                              Civil No. 10-05180


MICHAEL J. ASTRUE, Commissioner of
Social Security Administration                                  DEFENDANT

MEMORANDUM OPINION

## I.      Factual and Procedural Background

Plaintiff, Loretta June Kirkland, appeals from the decision of the Commissioner of the Social Security Administration denying her claims for disability insurance benefits ("DIB") and supplemental security income benefits ("SSI"), pursuant to §§ 216(I) and 223 of Title II of the Social Security Act, 42 U.S.C. §§ 416(I) and 423(d), and § 1602 of Title XVI, 42 U.S.C. § 1381a, respectively (collectively, "the Act"). 42 U.S.C. § 405(g).

Plaintiff protectively filed her DIB and SSI applications on February 29, 2008, alleging a disability onset date of February 11, 2008, due to cranial bleeding which caused headaches and seizures. T. 115. At the time of the onset date, Plaintiff was thirty three years old and was a high school graduate. T. 88, 121. She had past relevant work as a convenience store manager. T. 144. Plaintiff's applications were denied at the initial and reconsideration levels. T. 48, 71, 55, 57. At Plaintiff's request, an administrative hearing was held in Fayetteville, Arkansas, on August 17, 2009, at which Plaintiff testified. T. 7-24. Plaintiff was represented by counsel. *Id.* Administrative Law Judge ("ALJ") Edward M. Starr submitted interrogatories to Rehabilitation

Counselor Patti Kent, who also attended the hearing.  T. 171-174.  The ALJ subsequently issued

an unfavorable decision on November 30, 2009, finding that Plaintiff was not disabled within the

meaning of the Act.  T. 32-41.  On July 30, 2010, the Appeals Council found no basis to reverse

the ALJ's decision. T.1. Therefore, the ALJ's November 30, 2009, decision became the

Commissioner's final administrative decision.

## II.    **Relevant Medical History**

Plaintiff was feeling well in April of 2007 and nearing the end of her weekly treatments

for hepatitis C.  T. 405.  In June, her last month of treatment, she was feeling well except for

occasional nausea and heartburn.  She reported to the professionals at the Community Clinic at

Saint Francis House   that she was doing well on Prozac and hydroxyzine was working well for

her anxiety.  T. 401.

On February 11, 2008, Plaintiff was talking on the telephone when she began to feel

dizzy.  Everything went black, and the next thing she knew she was waking up on the floor.  She

was transported by ambulance to Northwest Medical Center in Springdale, Arkansas, where she

was placed under the care of Dr. Rodney Routsong.   CT scan revealed a cerebral arachnoid

hemorrhage (bleeding in the area between the brain and the thin tissues that cover the brain).   A

CT angiogram revealed two right-sided middle cerebral artery aneurysms.   Plaintiff was

transferred first to Washington Regional Medical Center in Fayetteville and then to St. Vincent

Infirmary in Little Rock, where she underwent additional testing.   Dr. Andrew Getzoff

performed a carotid and cerebral arteriogram, which revealed a 6x9 mm aneurysm (bulge or

ballooning in a blood vessel) at the right P-comm artery origin at the distal right internal carotid

artery.  Two additional, smaller aneurysms were found on the right MCA bifurcation.  A small

pseudoaneurysm was seen at the inferior aspect of the larger aneurysm, and was believed to be

the source of the hemorrhage.   T. 199-200.   Laboratory tests showed that Plaintiff had an abnormally low level of sodium in her blood, which put her at risk for further seizures.   Dr. Brian Bean treated her hyponatremia with a 3% saline solution.  T. 185.

On February 15, 2008, Dr. Steven Dunnagan performed a cerebral aneurysm coil embolization on the largest of Plaintiff's three aneurysms.   T. 201.   Dr. Dunnagan placed a small platinum coil through a catheter into the aneurysm, to which the body responds by forming a blood clot around the coil blocking off the aneurysm.  By plugging the weak bulging section of the artery, the risk of rupture greatly decreases.   Beaumont Health System, *Aneurysm Coil Embolization,*   http://www.beaumont.edu/interventional-procedures-anerurism-coil-embolism (last visited Sept. 27, 2011.)  Dr. Dunnagan described the procedure as "uncomplicated" and having a "satisfactory tactical result."  T. 202.  He chose not to coil the other two aneurysms at that time, but to follow Plaintiff's response to therapy.  After the procedure, Plaintiff complained of a headache, but another CT scan showed no evidence of new or acute intracranial bleeding or fluid collection in her brain.  T. 196.  Plaintiff was discharged from St. Vincent's on February 22.

On February 23, Plaintiff was taken by ambulance to the emergency room at Northwest Medical Center complaining of a severe headache, loss of consciousness and uncontrollable movements.  A CT scan showed that the subarachnoid hemorrhage had resolved and no acute intracranial abnormality was identified.  She was discharged the same day.  T. 253.

On March 12, Plaintiff was taken by ambulance to the emergency room at Northwest Medical Center complaining of frequent, worsening headaches.  She was nauseous and her right arm tingled, but she had not lost consciousness and was not running a fever or experiencing changes in vision.  A CT scan showed no acute disease and there were no abnormalities in her lab results; she was given Demerol for pain and Zofran for nausea. After a consultation with Dr.

Routsong, Plaintiff was diagnosed with acute cephalgia (headache), prescribed Phenergan for nausea and discharged with instructions to follow up with her private physician and return to the ER if her symptoms worsened or did not improve.  T. 345-347.

On March 30, Plaintiff met with Dr. Brad Thomas at Arkansas Neurosurgery Brain & Spine Clinic in Little Rock to develop a treatment plan for her remaining aneurysms.  Dr. Thomas described Plaintiff as "doing well" and performed a comprehensive neurological examination, finding no abnormalities or concerns.  He decided it would be best to wait for Dr. Getzoff to perform a second coil procedure, and that if he were unable to do so, Dr. Thomas would perform a right-sided craniotomy with aneurysm clipping.  T. 292-293.

Plaintiff returned to St. Vincent's on April 10 for a second coil procedure.  Dr. Dunnagan noted that Plaintiff had done well following the first procedure and suffered no complications; her headaches had also resolved.  After a conference with Dr. Thomas, Dr. Dunnagan decided to leave one aneurysm uncoiled, since they both felt it did not require treatment at the time.  After the "uneventful" procedure, Plaintiff recovered in the radiology department and was observed overnight in the coronary care unit.  She was discharged to return home the following day.  T. 352.

On May 15, Plaintiff returned to the emergency room at Northwest Medical Center complaining of tingling in her right foot and difficulty walking any significant distance.  A pelvic ultrasound showed no evidence of a pseudoaneurysm or other defect in the vessels of her leg.  T. 351, 357.

On May 29, SSA medical consultant Dr. Bill F. Payne reviewed Plaintiff's medical records and determined that Plaintiff could perform a full range of light work, including occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking about

six hours in an eight hour work day and sitting about six hours in an eight hour work day.  He found no postural, communicative or environmental limitations.  T. 222-229.

On June 20, Plaintiff returned to the emergency room at Northwest Medical Center complaining of coughing up blood followed by right-sided headache and tingling on the right side of her body.  A physical examination revealed no abnormalities and CT and MRI scans of her head were negative.  She was admitted to the Family Medicine Clinic for observation and placed on a low sodium diet.  The ER physician consulted with Dr. J. Michael Standefer to evaluate Plaintiff's neurological condition.  Dr. Standefer reviewed Plaintiff's laboratory and radiographic studies and noted no evidence of bleeding in the brain.  He requested Plaintiff's previous medical records and performed a lumbar puncture to rule out a subarachnoid hemorrhage.  There was no blood in Plaintiff's spinal fluid.  She was given medicine for pain and nausea and discharged on June 23.  T. 359-368.

On July 16, Plaintiff returned to the emergency room at Northwest Medical Center by ambulance, complaining of a headache of mild severity and moderate intensity.  She was sensitive to light but had no fever, seizure or loss of consciousness and her mental status was not altered.  She reported that she "usually gets Demerol and Phenergan for headaches in ER" once a month.  T. 378.  Nurse Darlene Smith's notes indicate that Plaintiff demonstrated theatrical behavior, poor effort with movement during exam and that she smelled strongly of cigarettes.  Physical and neurological exams showed no abnormalities and CT scan revealed no acute disease.  Plaintiff was given Demerol, Compazine and Benadryl.   Dr. Routsong was consulted and he thought that Lyrica might be causing her headache and advised she stop taking it.   By midafternoon she was feeling better and was discharged home with instructions to follow up with her doctor.  The diagnosis was "acute severe migraine headache."  T. 378-382

On July 24, Plaintiff went to Northwest Family Care in Springdale to establish a physician and receive treatment for high blood pressure. Dr. Robert Wilson diagnosed her with hypertension, daily headaches, hepatitis C, obesity and tobacco dependency. He advised her to stop smoking and lose weight and prescribed Darvocet for pain, Metoprolol for high blood pressure, and Amitriptyline. T. 424-425.

On August 4, Plaintiff saw Dr. Routsong at Neurosurgery Clinic, P.A. in Springdale. She reported no seizures since the two in February and that she felt much better on Amitriptyline (recently substituted for Prozac) and Metoprolol and was having "minimal difficulties" with headaches. Plaintiff was alert and cheerful at the visit and demonstrated good therapeutic response to her recent change in medicines. T. 421.

On August 7, SSA Medical Consultant Dr. Lucy Sauer reviewed Plaintiff's medical records through July 16 and affirmed Dr. Payne's assessment that Plaintiff could perform light work. T. 415.

On August 13, Plaintiff went to Northwest Family Care complaining of cough, headache and sinus trouble. Dr. William C. Kendrick diagnosed her with acute sinusitis, prescribed an antibiotic and advised her to avoid smoke, dust and fumes. T. 426-427.

On October 17, Plaintiff went to the emergency room at Northwest Medical Center by ambulance, complaining of sore throat, headache and stomachache. She was given Vicodin for pain and Phenergan for nausea, after which she reported feeling better. Rapid strep swab revealed that Plaintiff had strep throat. She was discharged with a prescription for antibiotics and told to take ibuprofen and acetaminophen for her headaches. T. 504-523.

On October 21, Plaintiff went to Northwest Medical Center for a follow-up to her coil procedure. Dr. Douglas Elliott performed a cerebral angiogram, noting no change in the

appearance of the two coil packs and no change in the third, uncoiled aneurysm.  Plaintiff was instructed to perform no strenuous or energetic activities for two days while the incision healed. T. 474-475.

On October 31, Plaintiff saw Dr. Routsong at Neurosurgery Clinic, and told him that her headaches were less intense.  She was alert, cheerful and mentally clear.  Dr. Routsong noted that she seemed to be doing well neurologically and that they discussed the multiple good side effects of Amitriptyline and Metoprolol.  He added Lisinopril for blood pressure control and advised her to return in two months.  T. 420.

On January 14, 2009, Plaintiff returned to Neurosurgery Clinic and reported to Dr. Routsong that the frequency and severity of her headaches had significantly decreased and that the Amitriptyline was helping her manage stress.  Dr. Routsong described Plaintiff as continuing to do well, neurologically.  Concerned about her blood pressure, Dr. Routsong advised her to see Dr. Wilson for further evaluation and control.  T. 419.

On January 17, Plaintiff went to Northwest Family Care for treatment of high blood pressure and depression.  She reported taking her medicine regularly and suffering no side effects.  Dr. Wilson diagnosed her with essential hypertension, depression, daily headache, hepatitis C, obesity and tobacco dependency.  He refilled her Darvocet, Metoprolol, Lisinopril and Amitriptyline prescriptions and added Wellbutrin.  T. 429-430.

On June 17, Plaintiff went to Northwest Family Care complaining of mild headaches and intermittent vomiting, but they would not see her, presumably because she owed them money for previous visits[1].  After being refused service, Plaintiff went to the emergency room at Northwest Medical Center, where she was examined and found to be in no acute distress.  An EKG

---

[1] Records from Northwest Medical Center indicate that Plaintiff was "refused secondary to problems with payment." T. 455.

produced no abnormal results and a CT scan showed that the coils in her brain were stable and there were no new aneurysms or bleeding.  Lab tests showed high levels of creatinine and white blood cells.  Emergency room physician Dr. Christopher Murphy contacted Dr. Routsong, who agreed that since Plaintiff was feeling better and had not vomited since she arrived in the ER, she should be discharged with instructions to see him the following day.  T. 452-467.

On July 7, Plaintiff returned to Northwest Family Care for prescription refills and a referral to continue seeing Dr. Routsong.  Dr. Wilson noted that Plaintiff's blood pressure was controlled on the current regimen and refilled her prescriptions for Lisinopril, Metoprolol and Amitriptyline.  T. 431.  The following day, Plaintiff returned to have blood drawn for laboratory testing.  Her thyroid stimulating hormone level was within normal range, her cholesterol and triglycerides were high and her albumin was low.  T. 434.

On July 10, Plaintiff went to Northwest Medical Center where Dr. Routsong performed a CT angiogram, which showed no changes in the coils and no new aneurysm or bleeding.  T. 445.

On August 17, Dr. Routsong completed a physical residual functional capacity questionnaire, in which he stated that Plaintiff's diagnosis was cerebral aneurysm bilaterally with coiling and her prognosis was good.  Her symptoms included frontal headaches late in the day, vomiting, short-term memory issues and blurred vision.  He noted her blood pressure was elevated (130/100) and that all other modalities were within limits.  He checked that her condition is affected by depression and psychological factors affecting her physical condition and that her symptoms would frequently be severe enough to interfere with attention and concentration needed to perform even simple work tasks.  He checked that Plaintiff could tolerate moderate work stress and added that while she could "tolerate some stress", she has "underlying anxiety/depression which could exacerbate symptoms related to disability."  T. 533.

Dr. Routsong opined that Plaintiff could walk two city blocks without rest or severe pain, sit for ten minutes at one time before needing to get up and stand for fifteen minutes before needing to sit down or walk around.  He indicated she could sit and stand/walk about two hours total in an eight hour work day and must walk for five minutes every five minutes.  He checked that she would need a job that permits shifting positions at will and would need to take unscheduled breaks.  T. 534.  He placed no restrictions on her mobility.  T. 536.

## IV.    Discussion

The ALJ determined that the claimant met the insured status requirements through June 30, 2012, that she had not engaged in substantial gainful activity since February 11, 2008, and that she had severe impairments of berry aneurysms, status postoperative; headaches; epilepsy; hypertension; and obesity.   T. 34.  The ALJ found, however, that the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR § 404, Subpart P, Appendix 1.  T. 36.   He also specifically found that Plaintiff's high cholesterol, hepatitis C and depression were not severe impairments.  T. 35.  The ALJ further found that Plaintiff's allegations regarding her limitations were not fully credible, and that the Plaintiff retained the residual functional capacity to perform unskilled, sedentary work with limitations.  T. 41.

Plaintiff filed this claim contending that the ALJ erred in considering Plaintiff's subjective complaints, erred in rejecting the opinion of Plaintiff's treating physician and should have ordered a mental consultative examination in order to fully develop the record.   Pl.'s Br. at 11, 12, 13.

## A.    Substantial Evidence Supports the ALJ's RFC Assessment

The ALJ found that Plaintiff has the residual functional capacity to lift and carry ten pounds occasionally and less than ten pounds frequently, sit for about six hours during an eight hour workday, and stand/walk for two hours.  She can occasionally balance, crawl, kneel, stoop, crouch and climb stairs and ramps.  She cannot climb ladders or scaffolds and must avoid hazards such as unprotected heights and moving machinery.  T. 37.

A claimant's RFC is the most she can do despite her limitations.  20 C.F.R. § 404.1545(a)(1).  The ALJ determines a claimant's RFC based on "all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations."  *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004).  The Eighth Circuit has stated that "a claimant's residual functional capacity is a medical question."  *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001).  Thus, although the ALJ bears the primary responsibility for determining a claimant's RFC, there must be "some medical evidence" to support the ALJ's determination.  *Eichelberger v. Barnhart*, 390 F.3d 584, 591; *Dykes v. Apfel*, 223 F.3d 865, 867 (8th Cir. 2000).  The Court notes that Plaintiff appears to place the burden of proof on the Commissioner.  It is the claimant, however, who bears the burden of proving her physical restrictions and/or residual functional capacity.  *See Geoff v. Barnhart*, 421 F.3d 785 (8th Cir. 2005).

The record provides substantial evidence to support the ALJ's RFC that Plaintiff can perform less than a full range of sedentary, unskilled work.  The ALJ performed a thorough review of Plaintiff's medical records and determined, after recording her complaints and diagnoses, that Plaintiff was under multiple severe impairments:  berry aneurysms, status postoperative; headaches; epilepsy[2]; hypertension; and obesity.  T. 34.  He specifically found

---

[2] The records do not show that Plaintiff was ever tested for or diagnosed with Epilepsy, but she did suffer from two reported seizures related to aneurysms.

that hepatitis C, high cholesterol, depression and mood swings were not severe impairments.  T. 34-35.

Plaintiff completed her treatment for hepatitis C in June of 2007, at which time she was described by staff at Community Clinic at St. Francis House as "feeling well."  T. 405.  As the ALJ pointed out, subsequent laboratory testing produced normal liver function results and Plaintiff submitted no evidence that hepatitis C imposed any limitations on her ability to work.  T. 458, 35.

Plaintiff testified that she has high cholesterol, but as the ALJ pointed out, she never sought treatment for it and presented no evidence that high cholesterol imposed any limitations on her ability to work.  T. 35.

The records indicate that Plaintiff was treated for depression and anxiety on an outpatient basis.   She testified that she suffered from mood swings, "where I'm angry one minute and happy-go-lucky the next.  And when I get in the angry moods, I don't care what I say to people. I'm not a very nice person."  T. 19.   The ALJ pointed out that Plaintiff never sought professional mental health treatment and was not hospitalized for any mental symptoms.  T. 35.   Her treatment included conservative doses of Prozac daily, later replaced with Amitriptyline at night and eventually supplemented with Wellbutrin, and the record shows that she took her medication regularly and reported no side effects.  T. 429.  The ALJ went on to evaluate Plaintiff's alleged mental impairments according to the psychiatric review technique, ultimately determining that Plaintiff's medically determinable impairments of depression and anxiety do not cause more than a minimal limitation in her ability to perform basic mental work activities.  T. 35-36.  Using the four functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00(C) of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1), the

ALJ determined that Plaintiff has no more than mild limitations in the functional area of activities of daily living. Specifically, he noted that Plaintiff reported to the Social Security Administration that she cares for her children, has no problem with personal care, prepares complete meals daily, does laundry and house cleaning, drives a car, goes out alone and shops in stores for food and personal needs. T. 35, 137-139. Plaintiff testified that she spends her time sitting or sleeping and that her children take care of themselves. T. 17.

The ALJ found that Plaintiff had no limitations in the functional area of social functioning. T. 35. She reported to the SSA that, while she had no hobbies or interests besides reading, she spends time with others talking on the phone or at her house daily and has no problems getting along with family, friends, neighbors or others. T. 140-141. The ALJ noted that at the time of the hearing, Plaintiff was engaged to be married.[3]

The ALJ found that Plaintiff has no more than mild limitations in the functional area of concentration, persistence or pace. T. 36. Plaintiff reported to the SSA that she is able to pay bills, count change, handle a savings account, use a checkbook/money orders, pay attention for as long as she needs to, finish what she starts, follow written and spoken instructions and handle changes in routine. T. 36, 141-142. Plaintiff reported that she does not handle stress well and gets lost driving sometimes. T. 36.

Finally, the ALJ found that Plaintiff had experienced no episodes of decompensation of extended duration. T. 36. Having found no more than "mild" limitations in any of the first three functional areas and no episodes of decompensation, the ALJ found her depression and anxiety to be non-severe. *Id.* This decision is supported by substantial evidence.

---

[3] Plaintiff has since married her fiancé and changed her name from "Moon" to "Kirkland." All of Plaintiff's medical records and SSA filings are under the name "Moon."

With respect to the impairments the ALJ did find to be severe, the ALJ separately discussed Plaintiff's impairments and subjective complaints, stating that he considered "all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p."   T.37.   He further stated that after "careful consideration of the evidence," he found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms.  T. 39.

As part of the determination of RFC, after reviewing the medical records, the ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to produce her alleged symptoms, but that her statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible.  T. 37.  An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  *See Polaski v. Heckler*, 739 F.2d 1320, 1332 (8th Cir. 1984).  The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and aggravating factors; and (5) functional restrictions.   *See Id.*    The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints.  *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004).  However, the ALJ need not explicitly discuss each Polaski factor.  *Strongson v. Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004).  The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints.  *Id.*  The issue is not whether Plaintiff suffers from any pain, but whether her pain is so disabling as to prevent the performance of any type of work.

*McGinnis v. Chater*, 74 F.3d 873, 874 (8th Cir. 1996).  In *Polaski,* the Eighth Circuit set forth the following pain standard:

> The adjudicator may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them.  The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints.  739 F.2d at 1322.

Questions of credibility are the province of the ALJ as trier of fact in the first instance. *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995).  The ALJ need not discuss every *Polaski* factor if he discredits Plaintiff's credibility and gives good reason for doing so.  If the ALJ gives good reasons for finding Plaintiff not credible, then the court should defer to his judgment when every factor is not explicitly discussed.  *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001).

The ALJ recognized the prevailing legal standard in considering Plaintiff's subjective complaints; specifically, the ALJ cited Social Security Rule 96-7p and took into account the *Polaski* factors.  T. 37-39.   The ALJ's credibility analysis was proper.  He made express credibility findings and gave multiple valid reasons for discrediting Plaintiff's subjective complaints.

 Plaintiff testified that she suffers from frequent, disabling headaches.  T. 15-16.   The ALJ noted that two of Plaintiff's aneurysms were successfully treated; CT images have shown on several occasions that the two coil procedures worked and that the third, untreated aneurysm was being monitored for change.  T. 38.  Following the coil procedures, Plaintiff reported having minimal difficulties with headaches (August, 2008), much less intense headaches (October, 2008) and less frequent and severe headaches (January, 2009).  T. 419, 420, 421.  The ALJ pointed out that Plaintiff is on relatively mild medications for headache; only when Ibuprofen

does not work does she take Darvocet.  T. 38.  Dr. Routsong's notes indicate that Plaintiff was neurologically doing well.  T. 419.  Plaintiff also complains of numbness and a feeling of "pins and needles."  T. 19-20.  Ultrasound of her right groin showed no evidence of a pseudoaneurysm and all physical examinations have revealed normal cranial nerves, lower extremity muscle strength and tone, reflexes, coordination, gate and station.  T. 38-39.

Plaintiff suffered two events described by her fiancé, father and mother as "seizures."  T. 128-133.  As the ALJ points, out, Plaintiff has had no seizures since February, 2008.  T. 38.  In addition, she is no longer taking seizure prevention medication.

Plaintiff testified that her doctors were "really concerned" about her high blood pressure, yet they were not concerned enough to put her on additional medication for hypertension.  T. 19.  Just one month before the ALJ hearing, Dr. Wilson charted that her blood pressure was controlled on the current regimen of Lisinopril.  T. 431.  If an impairment can be controlled by treatment or medication, it cannot be considered disabling."  *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004), quoting *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995).

The ALJ explained that Plaintiff was reported on one occasion to have exhibited theatrical behavior and put forth poor effort during an emergency room examination.  T. 39, 378.  The ALJ was entitled to draw conclusions about Plaintiff's credibility based on these observations.  *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006) *(citing Clay v. Barnhart*, 417 F.3d 922, 930 n.2 (8th Cir. 2005) (noting that psychologists' findings that the claimant was "malingering" on her IQ tests cast suspicion on the claimant's motivations and credibility); *Jones v. Callahan*, 122 F.3d 1148, 1152 (8th Cir. 1997) (holding that a physician's observation "of the discrepancies in [the claimant's] appearance in the examining room and those outside when he

did not know that he was observed" supported an ALJ's finding that the claimant's complaints were not fully credible.

It is important to note that despite Plaintiff's two brain surgeries and frequent visits to the emergency room, no physician ever placed any significant restrictions on Plaintiff's activities. Following an October, 2008 cerebral angiogram, Dr. Elliott told Plaintiff to avoid strenuous or energetic activity for *two days*. T. 474. After an emergency room visit that same month, Plaintiff was discharged with a return-to-work authorization, even though she had not worked since the previous February. T. 504. In her "Claimant's Recent Medical Treatment" form, Plaintiff wrote that she did not remember Dr. Routsong saying anything about whether she could work. T. 168. This lack of limitations related to her symptoms or impairments diminishes Plaintiff's credibility in her claim that she is disabled.

Review of the ALJ's decision, in light of the entire administrative record, shows that there were inconsistencies between Plaintiff's allegations of pain and the evidence as a whole. *Buckner v. Astrue*, 646 F.3d 549 (8th Cir. 2011). As a result, the ALJ did not err in evaluating Plaintiff's credibility.

In this case, the ALJ did not find that Plaintiff's impairments had no effect on her ability to work. Instead, he concluded, based on the medical records and testimony, that Plaintiff could only perform unskilled, sedentary work. For the above reasons, the court finds that the ALJ's treatment of Plaintiff's subjective complaints conforms to the requirements of *Polaski*. The ALJ's findings are supported by substantial evidence on the record as a whole.

Plaintiff alleges that the ALJ erred in rejecting the August 17, 2009, opinion of Dr. Routsong. Pl.'s Br. at 12. On the day of Plaintiff's hearing with the ALJ, Dr. Routsong

completed a physical residual functional capacity questionnaire[4].  T. 532-536.  Dr. Routsong opined that she could walk two city blocks without rest or severe pain, sit for ten minutes at a time before needing to get up and stand for fifteen minutes before needing to sit down or walk around.  He indicated she could sit and stand/walk about two hours total in an eight hour work day and must walk for five minutes every five minutes.  He checked that she would need a job that permits shifting positions at will and would need to take unscheduled breaks.  T. 534.

The amount of weight given to a medical opinion is to be governed by a number of factors including the examining relationship, the treatment relationship, consistency, specialization and other factors.  Generally, more weight is given opinions of sources who have treated a claimant, and to those who are treating sources.  20 C.F.R. § 1527(d).  The regulations provide that the longer and more frequent the contact between the treating source, the greater the weight will be given the opinions.  "When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source." *Id*. at (d)(2)(i). A treating source's opinion is to be given controlling weight where it is supported by acceptable clinical and laboratory diagnostic techniques and where it is not inconsistent with other substantial evidence in the record. *Id*. at (d)(2). Where controlling weight is not given to a treating source's opinion, it is weighed according to the factors enumerated above. *Id.*

While Dr. Routsong did treat Plaintiff several times between February, 2008 and August, 2009, the ALJ found his opinion to be inconsistent with the evidence of record and "too extreme to be accurate."  T. 39.  An ALJ may discount or even disregard the opinion of a treating

---

[4] The administrative record was held open until August 28, 2009, in order to provide a signed copy of Dr. Routsong's RFC questionnaire to Judge Starr.  T. 13, 529.

physician where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. *Perkins v. Astrue*, 648 F.3d 892 (8th Cir. 2011).

In his treatment notes, Dr. Routsong recorded that Plaintiff was having a good therapeutic response to her change in medications and was doing neurologically well. T. 420, 421. Other than high blood pressure (130/90 on October 4, 2008, October 31, 2008 and January 14, 2009), Dr. Routsong never mentioned abnormal or concerning physical symptoms, yet in his RFC he determined that Plaintiff was significantly limited in her ability to walk, sit and stand. A nurse's note on the RFC reads that according to the last dictation notes of Dr. Routsong, he intended <u>no restrictions</u> on Plaintiff's mobility. T. 536. The RFC states that Plaintiff "can tolerate some stress but has underlying anxiety/depression which could exacerbate symptoms related to disability." T. 533. This statement directly conflicts with his earlier findings that Amitriptyline was helping with Plaintiff's stress, that they discussed the "multiple good side effects of Amitriptyline) and that Plaintiff was alert and cheerful. T. 419, 420, 421. Dr. Routsong's records are devoid of any medical findings to support the extreme limitations he noted in his RFC. The Regulations and Eight Circuit precedent clearly require that a medical opinion be well-supported by medical evidence to be entitled to substantial or controlling weight. *Martise v. Astrue,* 641 F.3d 909 (8th Cir. 2011); 20 C.F.R. § 404.1527(d)(3).   A treating physician's opinion does not automatically control, since the record must be evaluated as a whole. *Perkins* at 892.

The ALJ gave some weight to the opinions of the state agency medical consultants and determined them to be reasonable based on the evidence available to them at the time. T. 39. Based on Plaintiff's testimony at her hearing and her subjective claims, the ALJ actually placed more limitations on Plaintiff's functional capacity than the consultants did. *Id.*

Opinions that a claimant is "disabled" or "unable to work" concern issues reserved to the Commissioner and are not the type of opinions which receive controlling weight. *Vossen v. Astrue*, 612 F.3d 1011 (8th Cir. 2010); *Ellis v. Barnhart*, 392 F.3d 988, 994 (8th Cir. 2005); see also S.S.R. 96-5p (July 2, 1996) (giving such opinions controlling weight would "in effect, confer upon the treating source the authority to make" disability determinations).

The ALJ did not err in assigning little weight to Dr. Routsong's residual functional capacity conclusions.

The ALJ has a duty to fully and fairly develop the record. *See Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995); *Freeman v. Apfel*, 208 F.3d 687, 692 (8th Cir. 2000). This can be done by re-contacting medical sources and by ordering additional consultative examinations, if necessary. See 20 C.F.R. § 404.1512. The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press her case. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010). However, the ALJ is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. *See Shannon v. Chater*, 54 F.3d 484, 488 (8th Cir. 1995)("reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial").

In developing the record, the Commissioner is required to obtain additional medical examinations and/or testing only if the record does not provide sufficient medical evidence to determine whether the claimant is disabled. *See Barrett v. Shalala*, 38 F.3d 1019 (8th Cir. 1994)(citing, in part, 20 C.F.R. 404.1519a(b)). *See also Dozier v. Heckler*, 754 F.2d 274(8th Cir. 1985)(reversible error not to order consultative examination when such evaluation is necessary to make informed decision). 20 C.F.R. 404.1519a(b) identifies several instances in which additional medical examinations and/or testing are warranted. They include the following: (1)

19

where the additional evidence needed is not contained in the records of the claimant's medical sources; or (2) where a conflict, inconsistency, ambiguity or insufficiency in the evidence must be resolved and the Commissioner is unable to do so by re-contacting the medical sources.

In this case the ALJ had available to him reports of treating professionals going back to 2007, including clinic visits, neurological consultations and follow-ups, and emergency room treatment.  The ALJ also had the opinions of two state agency medical specialists, Plaintiff's written statements to the Social Security Administration and her testimony from the hearing. The Court finds the ALJ satisfied his duty to fully and fairly develop the record in this matter.

**B.      Substantial Evidence Supports the ALJ's Determination That Plaintiff Can Perform Other Work That Exists in Significant Numbers in the National Economy.**

After finding that Plaintiff was unable to perform her past relevant work, the ALJ properly relied on vocational expert testimony to determine whether Plaintiff can perform other work available in the national economy.  T. 82.  *See* 20 C.F.R. §§ 404.1566(e), 416.966(e) (In determining disability, the Agency may use vocational expert testimony to determine whether a claimant can perform other occupations). The ALJ asked the vocational expert the following hypothetical question:

> Please assume a hypothetical person younger individual with high school education and the same work history as the claimant.   This person can occasionally lift/carry 10 pounds and frequently less.  She can sit for 6 hours and can stand/walk for 2 hours, she can occasionally balance, crawl, kneel, stoop and crouch and climb stairs and ramps.  She cannot climb ladders or scaffolds and must avoid hazards such as unprotected heights and moving machinery.  T. 172.

The Vocational Expert responded that the hypothetical individual would be able to work in three sedentary occupations:  Production Worker, of which there are 649 jobs in Arkansas and

24,231 in the U.S; Machine Tender, of which there are 225 jobs in Arkansas and 45,091 in the

U.S; and Hand Packer, of which there are 325 jobs in Arkansas and 32,359 in the U.S.  T. 173.

The ALJ then proposed a second hypothetical question:

Please change the limitations as follows:  this person cannot stoop, crouch, kneel, crawl or climb.  Unpredictable headache pain would require unscheduled and frequent rest periods.  She can lift only a few pounds and cannot productively sit, stand and walk sufficiently long to complete an 8 hour day on a sustained basis. T. 174.

The Vocational Expert testified that the unskilled labor market does not lend itself to

frequent rest periods and that there are no jobs at the sedentary level allowing a person to sit for

brief periods only.  T. 174.

The first hypothetical question posed by the ALJ in this case incorporated each of the

impairments that the ALJ found to be credible, and excluded those impairments that were

discredited or that were not supported by the evidence presented (as discussed *supra*).  The

Eighth Circuit has held that "an ALJ may omit alleged impairments from a hypothetical

question posed to a vocational expert when '[t]here is no medical evidence that these conditions

impose any restrictions on [the claimant's] functional capabilities;" or "when the record does

not support the claimant's contention that his impairments 'significantly restricted his ability to

perform gainful employment.'"  *Owen v.* Astrue, 551 F.3d 792, 801-802 (8th Cir. 2008)(quoting

*Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994).   Accordingly, the ALJ's determination

that Plaintiff could still perform work that exists in significant numbers in the national economy

is supported by substantial evidence.

**V.**     **Conclusion**

Having carefully reviewed the record, the undersigned finds that substantial evidence supports the ALJ's determinations at each step of the disability evaluation process, and thus the decision should be affirmed.   Accordingly, Plaintiff's complaint should be dismissed with prejudice.

ENTERED this 30th   day of September, 2011.

/S/  *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF U.S. MAGISTRATE JUDGE